406 F.3d 159
 Marcella LANDELL, Plaintiff-Appellee,
Donald R. Brunelle, Vermont Right to Life Committee, Inc., Political Committee, Neil Randall, George Kuusela, Steve Howard, Jeffrey A. Nelson, John Patch, Vermont Libertarian Party, Vermont Republican State Committee and Vermont Right to Life Committee-Fund for Independent Political Expenditures, Plaintiffs-Appellees-Cross-Appellants,
v.
William H. SORRELL, John T. Quinn, William Wright, Dale O. Gray, Lauren Bowerman, Vincent Illuzzi, James Hughes, George E. Rice, Joel W. Page, James D. McNight, Keith W. Flynn, James P. Mongeon, Terry Trono, Dan Davis, Robert L. Sand and Deborah L. Markowitz, Defendants-Appellants-Cross-Appellees,
Vermont Public Interest Research Group, League of Women Voters of Vermont, Rural Vermont, Vermont Older Women's League, Vermont Alliance of Conservation Voters, Mike Fiorillo, Marion Grey, Phil Hoff, Frank Huard, Karen Kitzmiller, Marion Milne, Daryl Pillsbury, Elizabeth Ready, Nancy Rice, Cheryl Rivers and Maria Thompson, Intervenors-Defendants-Appellants-Cross-Appellees.
 Docket No. 00-9159(L).
 Docket No. 00-9180(CON).
 Docket No. 00-9231(XAP).
 Docket No. 00-9239(XAP).
 Docket No. 00-9240(XAP).
 United States Court of Appeals, Second Circuit.
 April 11, 2005.
 As Amended April 20, 2005.
 As Amended May 11, 2005.
 
 1
 James Bopp, Jr., Esq., Bopp, Coleson & Bostrom, Terre Haute, IN, for Plaintiff-Appellee.
 
 
 2
 Joshua Ross Diamond, Esq., Diamond & Robinson, Montpelier, VT, for Plaintiffs-Appellees-Cross-Appellants.
 
 
 3
 Peter F. Welch, Esq., Welch, Graham & Manby, Burlington, VT, for Intervenors-Defendants-Appellants-Cross-Appellees.
 
 
 4
 Timothy Bert Tomasi, Esq., Attorney General's Office State of Vermont, Montpelier, VT, for Defendants-Appellants-Cross-Appellees.
 
 ORDER
 
 5
 Plaintiff-appellee and plaintiffs-appellees-cross-appellants filed a petition for rehearing with request for rehearing en banc from the amended opinion of the panel filed on August 18, 2004. A poll on whether to rehear the case en banc was conducted among the active judges of the court upon the request of an active judge of the court. Because a majority of the court's active judges voted to deny rehearing en banc, rehearing en banc was DENIED by order of the court filed on February 11, 2005, and amended on April 11, 2005, and April 20, 2005.
 
 
 6
 The court hereby AMENDS that order to reflect that, upon consideration by the panel that decided the appeal, as of the date of that order, the petition for rehearing was DENIED. Judge Winter dissents from the denial of rehearing.
 
 
 7
 The court also AMENDS the February 11, 2005, order to reflect (1) the opinions concurring in the court's denial of rehearing en banc filed by Judge Calabresi, Judges Straub and Pooler, and Judges Sack and Katzmann, and (2) the opinions dissenting from the court's denial of rehearing en banc filed by Chief Judge Walker, Judge Jacobs, Judge Cabranes, and Judge Raggi.
 
 
 8
 Judges Calabresi, Straub, Pooler, Sack, Sotomayor, Katzmann, and B.D. Parker concur in the denial of rehearing en banc. Chief Judge Walker and Judges Jacobs, Cabranes, Raggi, and Wesley dissent from the denial of rehearing en banc. With this order, Judge Calabresi is filing a concurring opinion; Judges Straub and Pooler are filing a concurring opinion; Judges Sack and Katzmann are filing a concurring opinion, in which Judges Sotomayor and B.D. Parker join; Chief Judge Walker is filing a dissenting opinion, in which Judges Jacobs, Cabranes, and Wesley join; Judge Jacobs is filing a dissenting opinion, in which Chief Judge Walker and Judges Cabranes and Wesley join; Judge Cabranes is filing a dissenting opinion, in which Chief Judge Walker and Judges Jacobs and Wesley join; and Judge Raggi is filing a dissenting opinion.
 
 
 9
 CALABRESI, Circuit Judge, concurring in the denial of rehearing en banc.
 
 I.
 
 10
 The prudential reasons given in the thoughtful opinion of Judge Sack and Judge Katzmann, infra at 165, would, in themselves, justify concurring in a denial of a rehearing en banc. I write separately, though, because I have an additional and rather different reason for voting against such a rehearing.
 
 
 11
 It seems to me that there are two principal values at play in the campaign finance debate. One is the desire to let individuals express the intensity of their political feelings, and to do so in a very particular way — that is, through money in the form of either campaign expenditures or contributions. This value has been consistently treated as deserving of First Amendment protection. See, e.g., McConnell v. Federal Election Commission, 540 U.S. 93, 134-38, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003); Buckley v. Valeo, 424 U.S. 1, 19-22, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Nonetheless, it is not absolute. For example, no one argues that a state is precluded from prohibiting the purchase of votes, even though buying votes amounts to the most direct way in which intensity of feelcan be expressed through the use of money. See 42 U.S.C. § 1973i(c). Cf. Brown v. Hartlage, 456 U.S. 45, 54-55, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982).[1]
 
 
 12
 The other value is the deeply felt desire not to have the wealthy be able to influence elections more than the poor.[2] This value, however, has two distinct aspects. The first is the generalized egalitarian desire not to advantage one group in society over another. The second—which is inextricably linked to the "intensity of expression" value and hence partakes of its First Amendment attributes—is that, given the unequal distribution of wealth, money does not measure intensity of desire equally for rich and poor. In other words, and crucially, a large contribution by a person of great means may influence an election enormously, and yet may represent a far lesser intensity of desire than a pittance given by a poor person. Cf. Federal Election Commission v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 257-58, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (discussing the "threat" posed to the "political marketplace" by corporate spending where "[t]he resources in the treasury of a business corporation" do not directly correlate to intensity of "popular support for the corporation's political ideas"). This way of looking at things is anything but new. See, e.g., Luke 21:3-4 (English Standard Version) ("Truly, I tell you, this poor widow has put in more than all of them. For they all contributed out of their abundance, but she out of her poverty put in all she had to live on.").[3] Significantly, though, this second aspect is reflective not only of egalitarian concerns, but as much of First Amendment libertarian ones.
 
 
 13
 The notion that intensity of desire is not well-measured by money in a society where money is not equally distributed has been, since Buckley, the huge elephant—and donkey—in the living room in all discussions of campaign finance reform. Buckley, by fiat, declared the state's explicit recognition and amelioration of wealth distribution problems in the electoral marketplace to be an insufficiently compelling interest to pass constitutional muster. Buckley, 424 U.S. at 17, 48-49, 96 S.Ct. 612. And yet, I submit, it remains at least implicitly behind much campaign finance reform legislation.
 
 
 14
 The odd thing about Buckley's exclusion of this interest from the field of discussion is that, as mentioned above, this concern is in part directly linked to the Supreme Court's asserted First Amendment concern—the desire to protect the right for people to express, in money terms, the intensity of their political ideas and affiliations. It may be that the High Court's failure to recognize this fact occurred because the Court in Buckley focused its attention on the desire not to favor one group, the rich, over another, the poor—or vice versa, see id. at 48-49, 96 S.Ct. 612. And, in deciding not to give weight to that value, the Court failed to realize that it was also excluding—as a potentially compelling state interest—the First Amendment right to have one's intensity of desire, as expressed in monetary terms, be measured equally.
 
 
 15
 Be that as it may, the Buckley framework, which establishes that the desire to express intensity of political position through money is fundamental, at the same time prohibits the states from seeking to find a way of gauging and treating intensity of desire equally among its citizens, rich and poor.[4] As a result of this odd decision, the judicial discussion since Buckley has centered on other values, which, though by no means unimportant, are, I believe, not really at the core of the debate. There is much talk of "corruption" and what controls are necessary to avoid it, and of the danger that what is done under the guise of controlling corruption may be used to protect incumbents. There is, likewise, concern about the cost of fundraising and similar factors. I do not mean to suggest that these are not serious questions. But a treatment of campaign financing that focuses primarily on those issues is surely impoverished, for it does not deal with what is at least as important, and, perhaps, at the very heart of the problem.
 
 
 16
 Indeed, because of Buckley, even academicians have focused on campaign finance reform primarily in the light of these subsidiary goals. Thus, some have tried to "solve" the campaign finance problem by providing for anonymous contributions. See, e.g., Ian Ayres & Jeremy Bulow, The Donation Booth: Mandating Donor Anonymity to Disrupt the Market for Political Influence, 50 Stan. L.Rev. 837 (1988). But that does nothing to ameliorate the fact that "intensity of desire" under Buckley depends on the underlying wealth of the donor, and hence is measured by a rubber yard stick. And this is so regardless of whether the donation is made openly or secretly. Others, trying to avoid corruption and protection of incumbents, and also to counter the advantage Buckley gave to the rich, seek to overwhelm individual contributions with massive funds made available to everyone for campaign spending. See, e.g., Bruce Ackerman, Crediting the Voters: A New Beginning for Campaign Finance Reform, Am. Prospect, Spring 1993, at 71; Edward B. Foley, Equal-Dollars-Per-Voter: A Constitutional Principle of Campaign Finance Reform, 94 Colum. L.Rev. 1204 (1994). But they do so in a way that undercuts the capacity of people, both poor and rich, to give financial expression to the relative intensity of their desire. Moreover, even the most sophisticated "hybrid" campaign finance proposals, in advocating complex combinations of donor anonymity, public funding, and controlled private giving, do not directly address this difficulty. See, e.g., Bruce Ackerman & Ian Ayres, Voting with Dollars: A New Paradigm for Campaign Finance 25-44 (2002).
 
 
 17
 Solutions that take into account both (a) the perceived need to protect the right to express one's intensity of desire in political matters through (among other mechanisms) money, and, at the same time, (b) the wish to measure and give effect to that intensity of desire in a way that is fair to the rich and the poor alike, are not obvious. Some potentially fruitful, if logistically challenging, suggestions have been made in other contexts. See, e.g., Philip Bobbit & Guido Calabresi, Tragic Choices 98-117 (1978) (discussing possibilities and limitations of wealth-distribution-neutral markets). But it remains the case that the finding of such solutions in the world of campaign financing has been, and will continue to be, severely hampered if the discussion taking place in legislatures and courthouses is centered—as it now is—not on the problem, but on collateral issues.
 
 
 18
 This is so, moreover, even if one considers those issues that I described as "collateral" — corruption, incumbent protection, fundraising, time, etc.—to be, themselves, of primary importance. Efforts to tailor all campaign finance reform to corruption—the one state interest heretofore recognized by the Supreme Court as sufficiently compelling to justify spending restrictions of any sort[5]—surely have constrained possibilities for creative proposals that may not fit comfortably into the proffered box.
 
 II.
 
 19
 I believe that it is not out of the question that Vermont, in passing Act 64, was as likely to be concerned with the goal of enabling of all Vermonters—be they political candidates or political contributors—to have something of an "equal" opportunity to express intensity of political desire, as it was with the possibility of corruption, saving time, or on the alleged desire to protect incumbents. Cf. Landell v. Sorrell, 382 F.3d 91, 100-02 (2d Cir.2004) (setting forth legislative findings in support of Act 64, including: (1) that "[a]s a result [of the rising cost of campaigns] many Vermonters are financially unable to seek election to public office"; (2) that "large contributors" gain time and access to candidates to an extent that "those who make small or no contributions" do not; and (3) that "public financing of campaigns, coupled with generally applicable contribution and expenditure limitations, will level the financial playing field among candidates and provide resources to independent candidates"). Indeed, I think that in Vermont, no less than in other places, interests and values such as corruption and time-saving are often defined in expansive ways so as to allow the introduction (under Buckley's doctrinal radar) of values that are directly related (1) to the wish to protect the right to express through money the intensity of one's desire, and (2) to make sure that that intensity is not measured differently for rich and for poor.[6]
 
 
 20
 I cannot help but suspect, however, that the sort of conversation taking place in Vermont (and elsewhere) would be a far more fruitful one—from the standpoints both of campaign finance policy and constitutional jurisprudence—were it able to be brought out from under Buckley's corruption mantle and into a framework that more honestly reflects the issues at play.
 
 III.
 
 21
 I do not know whether the decision of the panel in the case before us is consistent with Buckley v. Valeo. I do know that if I were on a panel I would have to decide that question, for I would be bound to follow Buckley, however much I think that that decision has diverted the campaign finance reform discussion from the fundamental First Amendment-level values at stake. If I am called upon to vote on a panel, I, of course, follow what I believe the Supreme Court to have held, and I do so whether or not I agree with that holding.
 
 
 22
 A vote on whether to grant an en banc rehearing, instead, is a "free vote." As the concurring opinion by Judge Sack and Judge Katzmann so elegantly points out, infra at 165-67, we may decline to vote to go en banc for any number of reasons, and we need not vote to rehear a case en banc simply because we think that an opinion is wrong or is possibly inconsistent with a prior Supreme Court decision. There are many prudential considerations that may, in different circumstances, properly guide us in our consideration of whether an en banc is appropriate. And so, in deciding whether to vote to rehear this case en banc, I posed myself the following question: which vote is most likely to bring back into the discussion the issues that I believe to be fundamental with respect to campaign finance legislation?
 
 
 23
 Ultimately, only the Supreme Court can, by reconsidering Buckley, encourage a free and open discussion of what is moving states in this field, and of what ways there might be of best serving the apparently conflicting interests at stake. Not surprisingly, a majority of the Supreme Court itself has indicated an inclination to reopen the question. See Federal Election Commission v. Colorado Republican Federal Campaign Committee, 533 U.S. 431, 465, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (Thomas, J., dissenting) (stating, joined by Justices Kennedy and Scalia, that "Buckley v. Valeo ... should be overruled"); Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 398-99, 120 S.Ct. 897 145 L.Ed.2d 886 (2000) (Stevens, J., concurring) (suggesting disagreement with Buckley's "[r]eliance on the First Amendment framework to justify the invalidation of campaign finance regulations"); id. at 405, 120 S.Ct. 897 (Breyer, J., concurring) (stating, joined by Justice Ginsburg, that reconsideration of Buckley may be necessary); id., 528 U.S. at 410, 120 S.Ct. 897 (Kennedy, J., dissenting) ("[T]he existing distortion of speech caused by the halfway house we created in Buckley ought to be eliminated."). And some have even urged reconsideration on grounds that could potentially recognize the need for equality in gauging intensity of desire in monetary terms. See, e.g., id. at 401, 120 S.Ct. 897 (Breyer, J., concurring) ("[B]y limiting the size of the largest contributions, such restrictions aim to democratize the influence that money itself may bring to bear on the electoral process." (citing Reynolds v. Sims, 377 U.S. 533, 565, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), thereby linking campaign finance jurisprudence to one-person, one-vote jurisprudence)).
 
 
 24
 I believe such a reconsideration to be essential. And, because I conclude that a reconsideration is more likely to occur if we do not rehear this case en banc than if we do, I concur in the denial of such a rehearing.
 
 
 25
 STRAUB and POOLER, Circuit Judges, concurring in the denial of rehearing en banc:
 
 
 26
 We concur in the Court's decision to deny rehearing en banc.
 
 
 
 Notes:
 
 
 [1]
 One could argue thatBuckley expressed skepticism toward characterizing "intensity" of political feeling, as manifested by the amount of money spent, as an independent First Amendment value. Thus, with respect to political contributions, Buckley stated that "[t]he quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." Buckley v. Valeo, 424 U.S. 1, 21, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Moreover, even with respect to campaign expenditures, much of Buckley's focus was on the impact that restricting the purchase of speech, by a candidate or other advocate, would have on the "marketplace of ideas," rather on the diminishment of the speaker's unilateral right to communicate his or her belief, and the intensity thereof. See, e.g., id. at 19-20, 47-48, 52-53, 96 S.Ct. 612.
 Nevertheless, and at times in tension with its statements concerning "undifferentiated, symbolic" acts of contribution, the Buckley Court clearly stated that the quantity and volume of individual political expression through contributions and expenditures was a protected First Amendment interest. Thus, in invalidating limitations on independent expenditures (often made by PACs), Buckley noted that the restrictions "preclude[d] most associations from effectively amplifying the voice of their adherents," and therefore were not only an interference with the groups' speech rights, but were "simultaneously an interference with the freedom of (their) adherents." Id. at 22, 96 S.Ct. 612 (internal quotations and citation omitted) (emphasis added). Buckley also said that spending caps directly interfere with the spender's "right to speak" his or her mind and "to engage in vigorous advocacy" in the course of an election, and it described these as rights that are "no less entitled to protection under the First Amendment than the discussion of political policy generally." Buckley, 424 U.S. at 48, 96 S.Ct. 612 (internal quotations and citations omitted); see also Federal Election Commission v. National Conservative Political Action Committee, 470 U.S. 480, 493, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("[F]or purposes of presenting political views in connection with a nationwide Presidential election, allowing the presentation of views while forbidding the expenditure of more than $1,000 to present them is much like allowing a speaker in a public hall to express his views while denying him the use of an amplifying system.").
 
 
 [2]
 My "wealthy" and "poor" nomenclature is, of course, shorthand. The same analysis applies with as great of force to members of the middle class
 
 
 [3]
 See also Buckley, 424 U.S. at 21-22 & n. 22, 96 S.Ct. 612 (noting that "[a]t most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate," and that "[o]ther factors relevant to an assessment of the `intensity' of the support indicated by a contribution include the contributor's financial ability and his past contribution history."). But see id. at 56, 96 S.Ct. 612 (observing that unlimited campaign expenditures are appropriate in part because, given contribution limitations, "the financial resources available to a candidate's campaign ... will normally vary with the size and intensity of the candidate's support").
 
 
 [4]
 Of course, it remains true that money is not the only means by which intensity of political belief may be expressed. In light of this obvious fact, it may perhaps be asserted that there is no compelling interest in giving individuals who lack financial resources an ability equal to that afforded to wealthier individuals to express intensity of feeling in the monetary marketplace of political discourse. But then the converse must also be true. That is, people or entities of means, whose contributions and expenditures campaign finance legislation might seek to limit, also enjoy alternate mechanisms for expressing the intensity of their political beliefs. And, if there is nothing uniquely important, in a First Amendment context, about expressing intensity of belief in monetary terms for those who do not have money, the same must presumably be true for those who do. In either case, though, the centrality of money in political campaigns makes it a uniquely important mechanism by which intensity of political belief is expressedCf. Buckley, 424 U.S. at 18 n. 17, 96 S.Ct. 612 (observing that the argument that "just as the decibels emitted by a sound truck can be regulated consistently with the First Amendment," so too may the "volume of dollars in political campaigns" be constitutionally restricted "underscores a fundamental misconception. The decibel restriction ... limit[s] the manner of operating a sound truck but not the extent of its proper use. By contrast, the [Federal Election Campaign] Act's dollar ceilings restrict the extent of the reasonable use of virtually every means of communicating information.").
 
 
 [5]
 Cf. National Conservative Political Action Committee, 470 U.S. at 496-97, 105 S.Ct. 1459 ("[P]reventing corruption or the appearance of corruption are the only legitimate and compelling interests thus far identified for restricting campaign finances." (emphasis added)).
 
 
 [6]
 The Supreme Court itself has seemingly endorsed a broader understanding of the "corruption" rationale than whatBuckley enunciated—an understanding that could perhaps be read as gesturing toward some of the "equality" considerations that Buckley purportedly purged from the debate. Thus, the Court in Shrink, rejecting the notion that "corruption" encompassed solely the notion of quid-pro-quo contribution arrangements, announced that the interest encompassed "the broader threat from politicians too compliant with the wishes of large contributors"—that is to say, politicians who give unequal weight to constituents on the basis of wealth. 528 U.S. at 389, 120 S.Ct. 897 (emphasis added); see also McConnell, 540 U.S. at 143, 150-52, 124 S.Ct. 619 (2003).
 
 
 
 27
 SACK and KATZMANN, Circuit Judges, with whom SOTOMAYOR and B.D. PARKER, Circuit Judges, join, concurring in the decision to deny rehearing en banc.
 
 
 28
 We agree with the decision of the Court not to rehear the decision of the panel en banc. We think it appropriate, in light of the opinions that are being filed dissenting from this view, to add a few words.
 
 
 29
 The issue for us, of course, is not whether the opinion for the panel majority or the dissent was right. Judge Winter's opinion dissenting from the panel opinion, see Landell v. Sorrell, 382 F.3d 91, 149 (2d Cir. 2004) (Winter, J., dissenting), is indeed thorough and forceful. Assuming that it is as sound as the dissenters say that it is, however, as Judge Feinberg reminded us in Baker v. Pataki, 85 F.3d 919 (2d Cir. 1996) (en banc) (per curiam), "[m]ere substantive disagreement with a panel decision is not, under FRAP 35,[1] sufficient reason for an in banc rehearing. If we do not follow the clear spirit of the Rule, we will become mired in endless internal review," id. at 941 (citing Jon O. Newman, Foreword: In Banc Practice in the Second Circuit, 1984-1988, 55 Brook. L.Rev. 355, 369 (1989); Jon O. Newman, Foreword: In Banc Practice in the Second Circuit: The Virtues of Restraint, 50 Brook. L.Rev. 365, 382 (1984)); see also James L. Oakes, Personal Reflections on Learned Hand and the Second Circuit, 47 Stan. L.Rev. 387, 392-93 (1995). The issue for us, then, is whether to grant a rehearing en banc because "the proceeding involves a question of exceptional importance." Fed. R.App. P. 35(a)(2).
 
 
 30
 Whether the question here is "of exceptional importance" is, for us, a close call. The issue of campaign finance and its relationship to First Amendment protection for political expression is obviously important, at least as a general matter. It is less clear to us, though, that the decision in the case that we are being asked to review is, at this stage, itself "exceptionally" important.
 
 
 31
 This case has been remanded to the United States District Court for the District of Vermont for further proceedings. Vermont and Vermonters may, in the course of or in connection with the proceedings in the district court, resolve these issues themselves. As for the impact of the decision elsewhere, if any, we simply do not know. We could only join the dissenters in speculation.[2] But if the Supreme Court does not grant certiorari in Landell or otherwise resolve the questions raised, and the panel opinion does lead other legislative bodies in this Circuit to enact campaign finance laws that share the characteristics of the Vermont law that Judge Winter thought constitutionally flawed, the doors to this Court will be open to a challenge. The resolution of such a challenge may ultimately indeed require en banc review. We may at that time need to reconsider the merits of the panel's decision en banc.
 
 
 32
 We think that some disputes, because of their highly partisan and political caste, should be addressed by the federal judiciary only when and insofar as is necessary. And we think that this is such a dispute. The resolution of this sort of campaign financing issue is bound to have, or at least to be seen to have, an impact favoring one political side or another depending on the result. We would prefer not to enter into a process that would likely result in a decision of our full Court that would therefore be vulnerable to accusations that it is driven by result rather than by legal analysis.[3] We should avoid it if we can do so responsibly.
 
 
 33
 We very much doubt, moreover, that were we to rehear this case en banc our work would add substantively to the Supreme Court's deliberations. Were the Supreme Court to decide to grant certiorari in this case, it would have before it the panel majority and dissenting opinions sharply defining the issues as well as the dissenting and concurring views as to whether this Court should undertake to rehear the panel decision en banc. If the dissenters are correct that the panel majority opinion fails to pass constitutional muster, a rehearing en banc of the panel decision would only forestall resolution of issues destined appropriately for Supreme Court consideration.
 
 
 34
 When it becomes, to use Chief Judge Walker's phrase, our "constitutional responsibilit[y]" to rehear this issue en banc—as it was the constitutional responsibility of the panel to hear it in the first place—of course we should do so. Until then, we think the Court has rightly decided to respect what Judge Newman referred to as the "Virtues of Restraint." See Jon O. Newman, Foreword: In Banc Practice in the Second Circuit: The Virtues of Restraint, supra.
 
 
 
 Notes:
 
 
 [1]
 "An en banc hearing or rehearing is not favored and ordinarily will not be ordered unless: (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance." Fed. R.App. P. 35(a)
 
 
 [2]
 Chief Judge Walker speculates,post at 168, that the panel opinion "could lead other legislative bodies in Vermont, and in other states within and without this circuit, to enact campaign-finance laws that trammel free-speech rights," and Judge Jacobs asserts, post at 177, that "[t]he green light has been given to New York and Connecticut (signatories to the States' amicus brief in support of the Act), the hundred counties, and the thousand municipalities under our jurisdiction, to consider and adopt similar limitations on campaign expenditures."
 
 
 [3]
 As noted, we think it unnecessary to take issue with the substantive views of our colleagues dissenting from the denial of an en banc hearing. We do note, nonetheless, the remarkable proposition asserted in part V of Judge Jacobs' dissent,post at 178 (apparently one of the things, as he puts it, that he "cannot resist saying," id. at 178): that at the heart of the panel majority's problems are "constitutional-law professors" and "news organs" subverted by a hidden agenda of some sort, post at 178. Suffice it to say that we doubt it. But it is this sort of suspicion of hidden agendas when addressing things political that helps animate our view that en banc rehearing is unwise at this time.
 
 
 
 35
 JOHN M. WALKER, JR., Chief Judge, with whom JACOBS, JOSÉ A. CABRANES, and WESLEY, Circuit Judges, concur, dissenting from the denial of rehearing en banc:
 
 
 36
 Among the many questionable features of Vermont's campaign-finance statute, the limits placed on campaign expenditures plainly violate Supreme Court precedent and the First Amendment. After a panel majority, over a well-reasoned dissent by Judge Winter, held that those limits were supported by a compelling interest, the full court should have reheard this case en banc. I dissent.
 
 I. Background
 
 37
 In 1997, the Vermont Legislature enacted Act 64, a comprehensive campaign-finance statute scheduled to take effect on November 4, 1998. See Vt. Stat. Ann. tit. 17, §§ 2801-2883. In May 1999, a voter, a prospective candidate, and a political-action committee brought suit in federal court in Vermont alleging that the statute infringed their First Amendment rights. See Landell v. Sorrell, 118 F.Supp.2d 459, 463, 475-76 (D.Vt.2000) (Landell I). The district court consolidated that suit with two other subsequent actions and permitted various other interested groups to intervene. Id. at 463. After a ten-day bench trial in May and June of 2000, the district court upheld most of Act 64's challenged provisions but struck down its limitations on (1) how much money political parties could contribute to candidates, (2) how much money candidates could accept from out-of-state contributors, and (3) how much money candidates could spend on their campaigns. Id. at 468, 493.
 
 
 38
 Four years later, in 2004 (after having withdrawn an opinion issued in 2002), a divided panel of this court upheld in part and reversed in part the district court's decision. Landell v. Sorrell, 382 F.3d 91 (2d Cir.2004) (Landell II). The panel unanimously upheld the district court's determination that the Vermont statute's limitation on out-of-state contributions was unconstitutional. Id. at 146; id. at 152 (Winter, J., dissenting) (concurring in this holding). The panel also unanimously reversed the district court's decision that contributions to candidates by political parties could not constitutionally be limited. Id. at 143 (so holding, but remanding for further findings on, among other issues, how Act 64 affects relations between national parties and state and local affiliates); id. at 152, 184-85 (Winter, J., dissenting) (concurring in this holding though challenging statutory provisions that treat party affiliates as one unit for some purposes). The panel was divided, however, over the constitutionality of the Vermont statute's limitations on candidates' campaign expenditures. Judge Winter, in dissent, would have upheld the district court's determination that campaign-expenditure limits are unconstitutional under Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Landell II, 382 F.3d at 153-56, 185-89 (Winter, J., dissenting). But the panel majority decided that the expenditure limits were supported by two government interests—preventing corruption and preserving candidates' time—that, taken together, were sufficiently compelling that the expenditure limits might be constitutional if the statute were sufficiently narrowly tailored to advance those two interests. Id. at 124-25. The majority therefore vacated the district court's holding as to the expenditure limits and remanded the case for further proceedings to determine whether the limits were sufficiently narrowly tailored to survive strict scrutiny. Id. at 135-36.
 
 
 39
 Judge Winter, in an impassioned, insightful, and carefully reasoned dissenting opinion, analyzed the Vermont statute in detail and identified a series of constitutional infirmities that the panel majority failed to consider sufficiently. Id. at 149-210 (Winter, J., dissenting). While I agree with virtually all of Judge Winter's analysis of the Vermont statute's many flaws, the panel majority erred most obviously, and most importantly, in not striking down the Vermont law's campaign-expenditure limits as violating the First Amendment's free-speech guarantee.
 
 
 40
 By leaving open the possibility that meager, incumbent-protective spending limits might pass constitutional muster, the majority has done a huge disservice to Vermont voters and has established a dangerous precedent that could lead other legislative bodies in Vermont, and in other states within and without this circuit, to enact campaign-finance laws that trammel free-speech rights and ensure incumbent protection.
 
 
 41
 Supreme Court precedent—principally the landmark holding in Buckley v. Valeo —leaves no doubt that the constitutional protection of political speech is essential to the very framework on which our political system is built. That precedent also plainly forbids campaign-expenditure limits like Vermont's. The en banc court should have reheard this exceptionally important case, found categorically that the Vermont law's expenditure limits violate the First Amendment, and wiped out the panel's holding that not only accepted a justification for Vermont's expenditure limits that the Supreme Court has rejected, but also glossed over the fact that the limits are so low that they unconstitutionally entrench incumbents. Instead, regrettably, the law of the circuit now conflicts both with Supreme Court case law and with decisions from the Tenth and Sixth Circuits holding similar campaign-expenditure limits unconstitutional. See Homans v. City of Albuquerque, 366 F.3d 900 (10th Cir.2004); Kruse v. City of Cincinnati, 142 F.3d 907 (6th Cir.1998).
 
 II. Discussion
 A. Supreme Court precedent compels reversal
 
 42
 In the nearly thirty years since Buckley, the Supreme Court has not retreated from Buckley's holding that laws limiting campaign expenditures are subject to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." 424 U.S. at 44-45, 96 S.Ct. 612. Although contribution limits merit "less rigorous scrutiny," McConnell v. FEC, 540 U.S. 93, 141, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), expenditure limits must survive strict scrutiny—i.e., they must be "narrowly tailored to serve a compelling state interest." Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). First Amendment protections extend to campaign expenditures because "[c]ertainly, the use of funds to support a political candidate is `speech'...." Id. As Buckley explained:
 
 
 43
 A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.
 
 
 44
 424 U.S. at 19, 96 S.Ct. 612 (footnote omitted).
 
 
 45
 The Court has identified only one distinct compelling state interest that can support campaign-finance restrictions: preventing corruption and the appearance of corruption. See FEC v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 496-97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("We held in Buckley and reaffirmed in Citizens Against Rent Control {454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) that preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances.") (emphasis added). The Court has relied on that interest, with a limited exception not relevant here, to uphold only contribution limits, not expenditure limits.[1] See McConnell, 540 U.S at 154, 161, 124 S.Ct. 619 (rejecting constitutional challenge to § 323(a) of the Federal Election Campaign Act, which "regulates contributions, not activities"); FEC v. Beaumont, 539 U.S. 146, 151-52, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003) (rejecting constitutional challenge to federal ban on campaign contributions by corporations); Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 381-85, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (Shrink Missouri) (rejecting constitutional challenge to Missouri statute limiting campaign contributions); Cal. Med. Ass'n v. FEC, 453 U.S. 182, 184-85, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (rejecting constitutional challenge to federal statute limiting contributions to multicandidate political committees); Buckley, 424 U.S. at 23-36, 38, 96 S.Ct. 612 (rejecting constitutional challenge to federal statute limiting campaign contributions). The Court has also upheld restrictions designed to prevent the circumvention of contribution limits, but because those limits were themselves justified by an anticorruption rationale, anti-circumvention is not an independent state interest. See, e.g., McConnell, 540 U.S. at 161, 124 S.Ct. 619 (noting that § 323(b) of the Federal Election Campaign Act, which the Court upheld, "is designed to foreclose wholesale evasion of § 323(a)'s anticorruption measures").
 
 
 46
 Further, in sweeping language Buckley rejected the state interest in limiting the overall cost of campaigns as a justification for campaign-finance restrictions:
 
 
 47
 The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government, but the people—individually as citizens and candidates and collectively as associations and political committees—who must retain control over the quantity and range of debate on public issues in a political campaign.
 
 
 48
 424 U.S. at 57, 96 S.Ct. 612.
 
 
 49
 Along with limiting the potential justifications for campaign-finance restrictions and establishing that expenditure limits are subject to no less than strict scrutiny, Buckley, properly read, established a per se ban on limiting candidates' campaign spending out of personal funds. To be sure, reasonable jurists disagree about whether Buckley should be read to have declared all campaign-expenditure limits per se unconstitutional. Compare Landell II, 382 F.3d at 152 (Winter, J., dissenting) ("[Buckley] held, without qualification, that government may not limit campaign expenditures by candidates for electoral office."), with Homans, 366 F.3d at 915 (Tymkovich, J., concurring) ("I agree that the Buckley Court did not adopt a per se rule against campaign spending limits."). Perhaps it is most accurate to say that Buckley's ban on expenditure limits is as close as possible to being a per se ban without the Court having used those exact words.
 
 
 50
 In any event, Buckley's language about limiting what candidates can spend on their campaigns from their own personal resources is surely unequivocal. After explaining that governmental interests in preventing corruption and equalizing candidates' relative financial resources could not justify restricting what candidates for federal office could spend out of their own pockets on their campaigns (a restriction found in § 608(a) of the Federal Election Campaign Act of 1971), Buckley concluded: "[M]ore fundamentally, the First Amendment simply cannot tolerate § 608(a)'s restriction upon the freedom of a candidate to speak without legislative limit on behalf of his own candidacy. We therefore hold that § 608(a)'s restriction on a candidate's personal expenditures is unconstitutional." 424 U.S. at 54, 96 S.Ct. 612.
 
 
 51
 In light of Buckley's exceptionally strong language about First Amendment protection for campaign expenditures—speech that goes to the heart of our constitutional democracy—it is not surprising that the Court has "routinely struck down limitations on independent expenditures by candidates, other individuals, and groups...." FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 441, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (Colorado Republican II).
 
 
 52
 When viewed in light of this Supreme Court case law that reflects a deep suspicion of—indeed, hostility to—legislative attempts to restrict political speech by limiting campaign spending, Vermont's campaign-expenditure limits fare no better than the limits struck down in Buckley.
 
 
 53
 B. No compelling interest supports Vermont's expenditure limits
 
 
 54
 The Landell II majority purported to apply strict scrutiny to the Vermont statute's expenditure limits and concluded that, taken together, the state's announced interests in (1) preventing corruption and the appearance thereof and (2) reducing the amount of time devoted by candidates to fundraising were sufficiently compelling to justify those limits. Landell II, 382 F.3d at 124-25. The majority went on to find that it lacked enough information to decide whether the limits were sufficiently narrowly tailored to survive strict scrutiny and ordered that the case be remanded to the district court for consideration of whether less-restrictive alternatives could have fulfilled the same goals. Id. at 133-36.
 
 
 55
 Putting aside spending limits on a candidate's use of his or her own funds (which, as noted above, Buckley flatly prohibits, but which the Vermont law imposes and the Landell II majority did not strike down), Buckley required, at minimum, that the Landell II panel find that Vermont's candidate-expenditure limits as a whole could not survive strict scrutiny for want of a compelling state interest. Here there was no compelling interest that could withstand strict scrutiny, and the panel therefore never had to reach narrow tailoring. The remand order was both unnecessary and unjustified.
 
 
 56
 First, Buckley makes plain that although the interest in reducing corruption or the appearance thereof may justify contribution limits, this interest cannot justify expenditure limits. As the Court noted in relation to the expenditure limits found in § 608(c) in the Federal Election Campaign Act of 1971, "[t]he interest in alleviating the corrupting influence of large contributions is served by the Act's contribution limitations and disclosure provisions rather than by § 608(c)'s campaign expenditure ceilings." 424 U.S. at 55, 96 S.Ct. 612. This language forecloses courts from relying on the corruption-prevention rationale to support expenditure limits. Indeed, courts have regularly applied Buckley to strike down expenditure limits that were ostensibly justified by the need to prevent corruption. See Homans, 366 F.3d at 917 (Tymkovich, J., concurring, writing for panel) (observing that "candidate spending limits cannot be justified by the anti-corruption rationale"); Kruse, 142 F.3d at 915 (same); see also Colorado Republican II, 533 U.S. at 441, 121 S.Ct. 2351. The Supreme Court has determined that the less-restrictive alternative of contribution limitations and disclosure requirements (both of which are found in Vermont's legislative scheme) suffice to prevent corruption, and it is not for us to gainsay this determination. The majority in Landell II paid lip service to this aspect of Buckley, see 382 F.3d at 119, but by relying on the anticorruption rationale in conjunction with the time-preservation rationale to justify expenditure limits, the majority ignored Buckley's holding that preventing corruption cannot justify expenditure limits.
 
 
 57
 Further, under the strict scrutiny that Buckley requires, the time-preservation rationale also cannot support expenditure limits. Indeed, the majority in Landell II implicitly acknowledges the time-preservation rationale's weakness by joining it to the anticorruption rationale as a means of ginning up a sufficiently compelling interest. Landell II, 382 F.3d at 125 ("Vermont has established two interests that, taken together, are sufficiently compelling to support its expenditure limits ....") (emphasis added).
 
 
 58
 First, Buckley expressly rejected cost containment (of which candidate time preservation is a function) as a justification for expenditure limits. 424 U.S. at 57, 96 S.Ct. 612. The Landell II majority, seizing on the fact that Buckley "alluded to this time-protection interest only in passing," 382 F.3d at 120, argues both that the Court did not consider it and that it (together with the discredited anticorruption interest) is a compelling justification for expenditure limitations. Both arguments fail. The time-preservation rationale was indeed argued to the Court under the rubric of cost containment, and it gains no strength from the fact that the Court rejected it summarily rather than at length. As Judge Tymkovich explained in Homans, "the Buckley Court did consider the exact argument made here, that the `thirst for money has forced candidates to divert time and energy to fund-raising and away from other activities, such as addressing the substantive issues.'" 366 F.3d at 918 (Tymkovich, J., concurring, writing for panel) (quoting Buckley, Br. of Appellees Center for Public Financing of Elections, Common Cause, League of Women Voters of the United States at 72-73); see also Landell II, 382 F.3d at 188-89 (Winter, J., dissenting). The Sixth Circuit in Kruse also rejected the time-preservation rationale, noting that under Buckley, "because the government cannot constitutionally limit the cost of campaigns, the need to spend time raising money, which admittedly detracts [sic] an officeholder from doing her job, cannot serve as a basis for limiting campaign spending." 142 F.3d at 916-17.
 
 
 59
 Moreover, in the nearly thirty years since Buckley, no court of appeals has found that saving a candidate's time from fundraising is a sufficient interest to justify stifling political speech. Candidate time preservation cannot be a compelling interest because, while the government may have a generalized interest in reducing impediments to an officeholder's performance of her job, the government has no legitimate interest in keeping incumbents in office at the expense of challengers. Where an officeholder complains that taking time to fundraise makes it harder to do the job and that the government has an interest in preventing this, the officeholder is saying in effect, "The government has an interest both in my doing my job and in getting me reelected by making campaigning (fundraising) easier." It has an interest in the former, but certainly not the latter. The decision to fundraise is the candidate's and, unless incumbent protection is a legitimate interest, not the business of the legislature. Judge Tymkovich suggests as much in Homans when he notes,
 
 
 60
 [O]fficeholders are not "forced" to spend any time making calls or otherwise seeking funds. That they choose to do so (allegedly at the expense of their other duties) seems to be a rather weak reason to override core First Amendment concerns. Freeing politicians from having to make that choice is not a compelling governmental interest.
 
 
 61
 366 F.3d at 919 (Tymkovich, J., concurring, writing for panel) (footnote omitted). Weighed against Buckley's broad protection of political speech, concerns about fundraising time pale in significance.
 
 
 62
 Finally, by holding that preserving candidates' time is a compelling justification for Vermont's expenditure limits, the Landell II majority has given its blessing to circular, self-justifying legislation. The Vermont statute forbids candidates to accept individual contributions from nonfamily members exceeding $200 (if running for state representative or local office), $300 (if running for state senator or countywide office), or $400 (if running for statewide office). Vt. Stat. Ann. tit. 17, § 2805(a). Though laughably low, the panel majority unanimously found these contribution limits to be constitutional. Setting aside my serious doubts on that score, such low limits require candidates to spend more time fundraising than would higher limits. In other words, the Vermont law's contribution limits increase demands on candidates' time, and the expenditure limits are then justified on the basis of time pressures that the law itself has intensified. The Landell II majority recognized that "without spending limits, the contribution limits would exacerbate the time problem," 382 F.3d at 123, but was untroubled by the self-evident circularity of the time-preservation rationale. Justifying a statute based on problems that the statute itself creates makes about as much sense as Baron von Munchausen's boast that he pulled himself up out of a swamp by his own hair. See, e.g., The Adventures of Baron Munchausen (Columbia Pictures 1989).
 
 
 63
 C. The Vermont law's expenditure limits are so low that they give incumbents an unfair electoral advantage
 
 
 64
 If the majority in Landell II gives too little deference to Buckley's guiding force, it gives too much deference to the Vermont legislature. Even Justice Breyer, who would prefer to give legislators more leeway in regulating campaign finance than governing Supreme Court doctrine provides them, cautioned against deferring to legislators if that deference "risk[s] such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge." Shrink Missouri, 528 U.S. at 402, 120 S.Ct. 897 (Breyer, J., concurring).
 
 
 65
 Vermont's expenditure limits (and, in my view, its contribution limits) are set so low and in such a fashion that only a desire to protect incumbents can explain them. At a time when the costs of political campaigns are routinely counted in the millions, what are Vermont's expenditure limits? To persuade voters of the merit of their candidacies, those who seek the office of state representative can only spend $2000 (in single-member districts) to $3000 (in two-member districts); state senate candidates are limited to $4000 (in single-member districts) plus $2,500 per additional seat in the district (in multi-member districts); candidates for governor and lieutenant governor are capped at $300,000 and $100,000, respectively; and candidates for other statewide offices can only spend $45,000. Vt. Stat. Ann. tit. 17, § 2805a.
 
 
 66
 The Landell II majority held that these limits were not unconstitutionally low because they approximated average spending in past elections. 382 F.3d at 128-31. As Judge Winter points out, however, these limits are drastically below realistic spending levels for competitive races. First, average spending across all elections understates the cost of competitive elections because it includes elections "that were not seriously contested or perhaps not contested at all — elections in which little communication took place and little was spent." Landell II, 382 F.3d at 173 (Winter, J., dissenting). Second, reported spending numbers for elections held before Act 64's passage include only spending by candidates, not related spending by their supporters. Id. at 172-73 (Winter, J., dissenting). Because Act 64 defines candidate expenditures to capture related expenditures by supporters, see Vt. Stat. Ann. tit. 17, § 2809, just to keep spending under the new law at historical levels would require setting expenditure limits above those historical levels. Finally, Act 64 includes within the expenditure limits "substantial costs of compliance with its terms that were not encountered under the prior law." Landell II, 382 F.3d at 173 (Winter, J., dissenting). For example, fees of attorneys — who are a virtual necessity under this reticulated statute — are included as campaign expenditures. Such compliance costs will further eat into limits that, because they are based on past average spending, are already so low that they unconstitutionally magnify the advantage of incumbents.
 
 
 67
 Only one aspect of Vermont's campaign-finance legislation seems to point away from incumbent protection as a motivation (and the panel majority seizes upon it, see id. at 128): incumbents can spend only 85 to 90 percent of what challengers can spend, depending on the office. Vt. Stat. Ann. tit. 17, § 2805a(c). This small gesture is greatly outweighed, however, by other features of the legislation and the natural advantages of incumbency. Most significantly, the spending caps cover a two-year election cycle and do not set separate caps for primary and general elections. Id. § 2805a(a). As Judge Winter aptly notes, this provision "will in the main favor incumbents, who face serious primary challengers less frequently than those seeking a party nomination to challenge an incumbent. Indeed, there appears to be little other reason justifying the choice of the two-year cycle." Landell II, 382 F.3d at 180 (Winter, J., dissenting). By contrast, the expenditure limits struck down in Buckley at least had the virtue of providing separate limits for primary and general elections. See 424 U.S. at 54-55, 96 S.Ct. 612. Further, the Vermont expenditure limits are so low that they "significantly increase[ ] the reputation-related [and] media-related advantages of incumbency and thereby insulate[ ] legislators from effective electoral challenge." Shrink Missouri, 528 U.S. at 404, 120 S.Ct. 897 (Breyer, J., concurring).
 
 III. Conclusion
 
 68
 This case began in the district court almost six years ago; it was argued before a panel of this court almost four years ago. Instead of cleanly resolving, on the basis of Buckley, that Vermont's campaign-expenditure limitations are unconstitutional, the panel majority has now sent the case back to the district court for yet more proceedings. I well appreciate and support the Second Circuit's traditional reluctance to hear cases in banc. See Jon O. Newman, The Second Circuit Review 1982-83 Term — Foreword: In Banc Practice in the Second Circuit: The Virtues of Restraint, 50 Brook. L.Rev. 365 (1984). By refusing to hear this important case en banc, however, the court has failed to live up to its constitutional responsibilities. I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 The Court has upheld limits only on campaign expenditures by corporations out of the corporate treasurySee Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990).
 
 
 
 69
 JACOBS, Circuit Judge, joined by JOHN M. WALKER, JR., Chief Judge, and JOSÉ A. CABRANES and WESLEY, Circuit Judges, dissenting from the denial of rehearing en banc.
 
 
 70
 I dissent from the denial of rehearing en banc.
 
 
 71
 I cannot add to the number or force of the arguments set out in Judge Winter's dissent from the majority opinion. Landell v. Sorrell, 382 F.3d 91, 149 (2d Cir. 2004) (Winter, J., concurring in part and dissenting in part) [hereinafter Landell Dissent]. Compelling as Judge Winter's dissent is qua dissent, it transcends the genre. It is scintillating; it marshals the facts and authorities in a way that is learned and witty, often at the same time; it is a crackling good read by any standard of law or letters.
 
 
 72
 I will therefore confine myself to (i) reasons why en banc review is warranted now rather than after the remand, and (ii) things I cannot resist saying.
 
 
 73
 * It cannot be seriously disputed that the issues presented are of exceptional significance. Vermont's Act 64 rations the political speech of all candidates seeking any state office in one of the three states within our jurisdiction, and it applies all the time, in back-to-back two-year cycles. See 1997 Vermont Campaign Finance Reform Act (codified as Vt. Stat. Ann. tit. 17, §§ 2801-2883).
 
 
 74
 To justify this sweeping limit on political speech, the Vermont Legislature invokes two interests: (a) fighting corruption (and the appearance thereof) and (b) conserving the time of public officials. The majority opinion accepts these interests as the genuine purposes of the Act and holds that, taken together, they are a compelling justification that satisfies strict scrutiny; it remands only for the district court to decide whether the Act's expenditure limits are narrowly tailored. Landell, 382 F.3d at 124-25, 135-37. This remand for narrow tailoring presumes — erroneously — that the Legislature's professed interests are compelling. I conclude they are not compelling, and that we may not take on trust that the interests professed by the incumbents who enacted the Act are their interests in fact — especially since the dominant but impermissible effect of the Act is to protect incumbents.
 
 
 75
 A. The Legislature's Asserted Interests Are Not Compelling
 
 
 76
 Buckley unambiguously rejected the anti-corruption rationale for limiting (candidate and independent) expenditures in political campaigns. See Buckley v. Valeo, 424 U.S. 1, 45-47, 53, 55-58, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).[1] The interest in saving the time of elected officials is demolished by Judge Winter in his dissent, 382 F.3d at 192-94. Ironically, Vermont officials could reduce the amount of their time spent fundraising simply by raising or eliminating the contribution caps they previously enacted (and further reduce by the Act), which obviously require contacts with more donors in order to raise a given amount of money. See Landell, 382 F.3d at 123-24. Thus the more-restrictive expenditure limits have been enacted to mitigate the inevitable and predictable side-effects of the less-restrictive contribution limits. See id. at 123-24, 127-28. It is as though a town were to justify a ban on adult establishments by citing the noxious concentration of them caused by a prior ordinance designating a single block as the sole zone for such enterprises. Strict scrutiny does not tolerate such bootstrapping. Thus in Buckley, the Court warned that because expenditure limits directly restrict political speech, FECA's independent expenditure limits could not "be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limitations." 424 U.S. at 44, 96 S.Ct. 612.
 
 
 77
 The panel opinion contends that the combination of these two insufficient interests is enough, a sort of synergy of nothing with nothing. Strict scrutiny is not so yielding, especially here: "`[I]t can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" Buckley, 424 U.S. at 15, 96 S.Ct. 612 (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)). A remand for narrow tailoring cannot remedy the root defect that the Act's prohibition on speech serves no compelling state interest (just as tailoring was not the problem with the Emperor's New Clothes).
 
 B. The Act Entrenches Incumbents
 
 78
 By remanding for narrow tailoring, the majority opinion implicitly assumes that the interests cited by the Vermont Legislature are genuine (as well as sufficient), and that the sole effect of the Act will be to advance those interests. But when a law restricts speech in a way that tends to insulate office-holders from challenge, it is neither reasonable nor prudent to treat legislative motive as an issue of fact. See Landell, 382 F.3d at 112-14 ("[W]e do not question the validity of the factual findings developed by the legislature in support of Act 64[.]"). Protecting speech requires that courts be skeptical and assume the worst — not as a matter of fact, but as a matter of prudence and policy.
 
 
 79
 Here, it is easy to demonstrate that the salient effect of the Act is to entrench incumbents — an effect that is fatal under the First Amendment. Buckley characterized as "more serious" the argument that contribution and expenditure limits, taken together, "invidiously discriminate against major-party challengers and minor-party candidates." 424 U.S. at 31 n. 33, 96 S.Ct. 612. The Court warned that though "the Act, on its face, appears to be evenhanded[, t]he appearance of fairness ... may not reflect political reality." Id. Given the powerful built-in advantages of incumbency, "the overall effect of the contribution and expenditure limitations [in FECA] could foreclose any fair opportunity of a successful challenge." Id.
 
 
 80
 Strict scrutiny therefore requires that we consider the Vermont Act, and specifically the Legislature's proffered interests, with a cold eye. That is what the Supreme Court did in Legal Services Corp. v. Velazquez, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). The Government cited budgetary and prudential reasons for legislation curtailing funds for legal service organizations that challenged existing welfare law. Velazquez disregarded those reasons because the effect of the legislation was unconstitutionally to "insulate the Government's interpretation of the Constitution from judicial challenge." Id. at 547-49, 121 S.Ct. 1043. Here, the undeniable effect of the Act is to insulate incumbents from effective electoral challenge — a much more direct and effective way to insulate the government from criticism and ouster.
 
 
 81
 It is beyond dispute that campaign-expenditure caps magnify the already formidable advantages of incumbency. Among those advantages are name recognition and news coverage; free staff use and constituent services; official letterheads and websites; franking privileges; the celebrity and glamor that attends office-holders when they visit diners, schools, nursing homes, churches, hospitals, clubs, bus-stops and barbershops; etc., etc. See Landell Dissent, 382 F.3d at 178-81. The Act further benefits incumbents because the expenditure caps are the same whether or not a candidate faces a primary contest — which of course is more frequently a hurdle for challengers than for incumbents. See id. at 160-61, 180.
 
 
 82
 The panel majority urges that the Act's expenditure limits "are not so radical in effect as to drive the sound of a candidate's voice below the level of notice." Landell, 382 F.3d at 128-31 (quotation omitted). But as Judge Winter points out, under a "level of notice" standard, an incumbent, who by virtue of her position already enjoys prominence in the community, starts her campaign "at the `level of notice' at which a challenger's campaign may be stopped by government." Landell Dissent, 382 F.3d at 199.
 
 
 83
 It would take a childlike credulity to think that these advantages to incumbency have gone unnoticed by Vermont's elected officials.[2] That is why I am unimpressed by the argument that the Act was adopted by an overwhelming bipartisan majority. See Landell, 382 F.3d at 100. If one is an incumbent office-holder in Vermont, what's not to like?
 
 II
 
 84
 The panel majority upholds without remand provisions of the Act that enforce the caps on fundraising and contributions by treating local, county, state, regional, and national affiliates of a political party as a single unit. See Vt. Stat. Ann. tit. 17, §§ 2801(5), 2805. These provisions will stifle local politics by weakening (or killing) county, municipal, and village party organizations across the state. This is no small thing. Local parties frequently part company from the state and national party in order to appeal to the social, political, cultural, and demographic profiles of their communities. No such pervasive suppression of political activity has ever been accepted by an American appellate court with scrutiny so deferential and perfunctory. See Landell, 382 F.3d at 143-44.
 
 III
 
 85
 Delay pending remand saves us nothing. No matter what happens on remand, there will be an appeal by one side or the other, maybe both. And in the interval — while the case is on remand in the district court, and during the post-remand appeal — the holdings of the majority opinion will be law of this Circuit. The green light has been given to New York and Connecticut (signatories to the States' amicus brief in support of the Act), the hundred counties, and the thousand municipalities under our jurisdiction, to consider and adopt similar limitations on campaign expenditures.
 
 
 86
 Moreover, the terms of the remand create problems of their own. What evidence is a judge supposed to examine to determine whether one type of regulation or one particular dollar amount is "as effective" as another at preventing corruption or conserving an office-holder's time? See id. at 133-36. Worse, the district court is being asked to make findings as to what level of spending will induce Vermont politicians to make corrupt decisions. See id. at 134-36. This kind of inquiry is grossly inappropriate for a federal court.
 
 IV
 
 87
 There is another (overriding) problem that cannot be fixed on remand. Obviously, the Act was engineered to provide an opportunity for the Supreme Court to revisit existing law in this area. The Vermont Secretary of State has publicly noted the "express legislative goal of giving the Supreme Court an opportunity to reevaluate its decision in Buckley v. Valeo." Memorandum from Secretary of State Deborah L. Markowitz re: Review of Practical Policy and Legal Issues of Vermont's Campaign Finance Law (Jan. 9, 2001), available at http://vermont-elections.org/elections1/2001GAMemoCF.html. But until the Supreme Court alters course, we must follow straight. See State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."); see also Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Activists on every side may start or incite litigation with test cases and test laws. But it is not our role to provoke the Supreme Court into reconsidering its precedent by an aggressive (or fanciful) ruling on a vital subject. This is a matter of hierarchy.
 
 V
 
 88
 Would any judge uphold any limit on political speech if it were not that many constitutional-law professors and news media lend their prestige and voice to such measures? It is a big mistake, however, to decide a case on the buried assumption that these self-described protectors of the First Amendment confer a reliable imprimatur.
 
 
 89
 Constitutional rulings cannot safely be made on the assumption that constitutional-law professors serve the Constitution as disinterested scholars and technocrats. These professors take no oath to support the Constitution. Granting that some of them have expertise derived from long and painstaking study, we should keep in mind that many of them regard the Constitution instrumentally — the way a safecracker regards a safe.
 
 
 90
 Similarly, the news organs are interested players in political controversy. It is a fallacy to think that the press is a reliable defender of speech or that the First Amendment is safe in its hands. True, the mainstream press assiduously defends its own expressive and commercial rights, as well as the rights of those whose speech generates saleable news and those who do not compete with the press for influence (such as skinheads, pornographers, performance artists, and the like). But no one should be surprised that the largest news media, secure in their editorial powers, join avidly in suppressing speech by competing sources of information and opinion at campaign time.
 
 
 91
 One arresting irony of this case is that the present Act can be used to limit the speech of the newspapers and the broadcast media. If a newspaper wishes to publish a story on a candidate and requests a photo, interview, or statement, and if the candidate provides such materials, the value of the ensuing publication counts against the candidate's contribution and expenditure limits. See Landell Dissent, 382 F.3d at 168-69. And in time, Vermont's legislators may conclude that the newspapers and broadcast media so control the public agenda, so forcefully channel legislative energies to serve publishers' views and interests, and so thoroughly monopolize the time of legislators vying for journalistic coverage and approval, that some reasonable limits should be placed on them. The Fourth Estate may be able to defend itself, but under the majority's decision, the Fourth Estate may not be able to get much help in the federal courts of this Circuit.
 
 
 92
 * * * *
 
 
 93
 States may be laboratories of democracy, and they should have leeway to experiment, but innovation is limited by the Constitution. The Act at issue in this case is as unconstitutional as if Vermont were to create a dukedom, apply the thumbscrew, or tax Wisconsin cheese.
 
 
 
 Notes:
 
 
 [1]
 Over the intervening three decades, the Supreme Court has deviated from this holding just once and narrowly, to deal with concerns raised by the "unique state-conferred corporate structure."Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 659-60, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990).
 
 
 [2]
 A fig leaf provides that incumbents may spend only 85 or 90% of the full limits (depending on the race)See Vt. Stat. Ann. tit. 17, § 2805a(c). This just shows that the Legislature understood that offense is better than defense; not a word in the record suggests that this marginal differential is sufficient to overcome the numerous and powerful advantages of incumbency.
 
 
 
 94
 JOSÉ A. CABRANES, Circuit Judge, with whom JOHN M. WALKER, JR., Chief Judge, and JACOBS and WESLEY, Circuit Judges, join, dissenting from the denial of rehearing en banc.
 
 
 95
 I am pleased to join the opinions of Chief Judge Walker and Judge Jacobs, dissenting from the denial of rehearing en banc. I add only a brief comment.
 
 
 96
 In his comprehensive and fully persuasive dissent from the decision of the panel, with which I concur fully, Judge Winter ably and admirably identified the grave constitutional concerns raised by Vermont's Campaign Finance Reform Act, codified at Vt. Stat. Ann. tit. 17, §§ 2801-2883 ("Act 64"). Judge Winter's opinion is a tour de force and, as Judge Jacobs aptly observes, a great read. I take this opportunity to commend Judge Winter's opinion to readers, including most especially the Justices of the Supreme Court. I write separately only to reemphasize one concern with our Court's decision to deny en banc review of this case.
 
 
 97
 Under Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), Act 64's campaign expenditure limits are, without a doubt, unconstitutional. See, e.g., Buckley, 424 U.S. at 39, 96 S.Ct. 612 (recognizing that campaign expenditure limits, even when "neutral as to the ideas expressed, limit political expression `at the core of our electoral process and of the First Amendment freedoms'"). In our system, the Supreme Court is free to revisit this question and free to overrule its own precedents. A court of appeals is not at liberty to do the same.
 
 
 98
 The particular expenditure limits imposed by Act 64 are so laughably low[1] that they cannot but impede meaningful debate of public issues in violation of the First Amendment's guarantee of free speech. See Buckley, 424 U.S. at 93 n. 127, 96 S.Ct. 612. The attempts of the Vermont legislature to dress up the "legitimate" rationales buttressing Act 64 — fighting corruption and conserving public officials' time — collapse under the weight of Act 64's more probable consequences, which include (1) an almost certain and drastic reduction of political speech, (2) potentially insurmountable disadvantages to challengers of incumbents, and (3) severe limitations on press coverage of political races. See Landell v. Sorrell, 382 F.3d 91, 176-82 (2d Cir.2004) (Winter, J., dissenting).
 
 
 99
 Where government seeks to "regulate political speech the way it regulates public utilities," id. at 153, and protects incumbents at the expense of political expression, it is the role of the courts to defend the Constitution and to promote the principles of free speech that sustain our democratic order, not to enable bald-faced political protectionism.
 
 
 100
 The majority's ruling is a clear departure from the Supreme Court's ruling in Buckley. I therefore dissent from the denial of rehearing en banc.
 
 
 
 Notes:
 
 
 [1]
 See Vt. Stat. Ann. tit. 17, § 2805a (limiting campaign expenditures based on office candidate is seeking: $300,000 for governor; $100,000 for lieutenant governor; $45,000 for secretary of state, state treasurer, auditor of accounts or attorney general; $4,000 for state senator, plus an additional $2,500 for each additional seat in the senate district; $4,000 for county office; $3,000 for state representative in a two-member district; and $2,000 for state representative in a single-member district).
 
 
 
 101
 RAGGI, Circuit Judge, dissenting from the denial of rehearing en banc:
 
 
 102
 I dissent from the court's denial of rehearing en banc without joining in the thoughtful opinions of my dissenting colleagues. I think that this case presents serious questions that warrant further consideration by the whole court, but I am disinclined to express an opinion on the merits without the benefit of further briefing and argument.